IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

REBECCA F. WALTON,           )
                               )
       Plaintiff,          )
                               )
v.                            )  CASE NO. 2:08-cv-5-MEF
                               )
NEPTUNE TECHNOLOGY GROUP, INC., )
*et al.*,                    )
                               )  (WO-Not Recommended for Publication)
       Defendants.       )

## MEMORANDUM OPINION AND ORDER

This suit is a dispute between Plaintiff Rebecca F. Walton ("Walton") and her former employer Neptune Technology Group, Inc. ("Neptune"). Walton contends that during her employment with Neptune, her supervisor Robert Conklin ("Conklin") subjected her to unwelcome sexual advances and retaliated against her after she rebuffed them.[1] She also complains that she suffered discrimination at the hands of Neptune on account of her age and her actual or perceived disability. Finally, she contends that Neptune retaliated against her for exercising her statutory rights to seek accommodation of her disability. Walton brings claims against Neptune under Title VII of the Civil Rights Act of 1964, as amended, 42

---

[1] While Walton originally also brought suit for sexual harassment by Conklin during her employment with Neptune, she clarified at the pretrial that she was abandoning such claims. Her pretrial contentions correctly reflect this election to relinquish those claims. Accordingly, to the extent that Defendants seek summary judgment on Walton's claims pursuant to Title VII for alleged sexual harassment, the motion is due to be DENIED as MOOT.

U.S.C. § 2000e *et seq.* ("Title VII"); the Age Discrimination in Employment Act of 1967

("ADEA"), 29 U.S.C. § 621 *et seq.*; and the Americans with Disabilities Act, 42 U.S.C. §

12101 *et seq.*[2]  The case is currently before the Court on the Motion for Summary Judgment

(Doc. # 17) filed on March 10, 2009, by Neptune.  For the reasons set forth below, the

Motion for Summary Judgment is due to be GRANTED in part and DENIED in part.

## JURISDICTION AND VENUE

Jurisdiction over this matter is asserted pursuant to 28 U.S.C. §1331 (federal question)

and 28 U.S.C. § 1343(a)(3) (civil rights).  The parties do not contest personal jurisdiction or

venue and the Court finds adequate allegations of both.

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'genuine' if the record as a whole

could lead a reasonable trier of fact to find for the nonmoving party.   An issue is 'material'

if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc.*

*v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty*

---

[2]  It appeared from the Complaint that Walton also may have had claims pursuant to
Alabama law, but she has clarified in her contentions for the pretrial order that she has no
claims pursuant to Alabama law.

2

*Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as

a matter of law.  *See* Fed. R. Civ. P. 56(c).

## FACTS

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion.  The submissions of the parties, viewed in the light most favorable to Walton, the non-moving party, establish the following material facts:

**A.  Walton's Experience Prior to Beginning to Work Under Conklin's Supervision**

Neptune hired Walton as a cell meter operator in September of 2003.  Initially, Walton worked on the third shift and Ed Henderson ("Henderson") was her supervisor.  On one occasion in May of 2004, Henderson documented some concerns about Walton's work performance in a document addressing his recommendation that Neptune delay a merit increase in Walton's pay.  Henderson specially noted was that Walton had been observed not participating in department housekeeping and that she had conduct and attitude problems in her interactions with both co-workers and supervisors.  Despite this delay in increasing her pay, in her three and a half years of employment, Neptune eventually increased Walton's pay from $10.50/hour to $16.06/hour.

**B.  Walton's Experience with Conklin as a Supervisor**

Eventually, Walton transferred to second shift.  Her new supervisor on that shift was Ricky Morgan ("Morgan").  After Morgan transferred to first shift, Conklin became the second shift supervisor in August of 2006.  Neptune terminated Walton's employment on November 30, 2006.  At the time of the termination of her employment, Walton was fifty-two

years old.  This lawsuit arises out of Neptune's decision to terminate Walton's employment and Conklin's treatment of Walton from August of 2006 until November 30, 2006.

In 2005, Walton began experiencing various problems with her health.  By 2006, Walton suffered from rheumatoid arthritis, fibromyalgia, migraine headaches, neuropathy in her feet, and optic neuritis, which can be a precursor to multiple sclerosis and can affect depth perception.  Walton recalls discussing some of her medical issues with Conklin including the migraine headaches, fibromyalgia, neuropathy in her feet, and her belief that she was likely developing multiple sclerosis.  On April 21, 2006, one of Walton's doctors limited her to a forty hour work week for medical reasons.  Neptune approved intermittent Family and Medical Leave Act leave to accommodate this restriction and did not require her to work more than forty hours Monday through Friday.  She was not assigned to work weekends or overtime.

According to Walton, she kept her supervisor and the director of human resources well informed about her medical problems.  Furthermore, Walton indicates that her supervisors prior to Conklin had allowed her to rotate to less physically taxing jobs and had let her work where she was less likely to become overheated.  Conklin did not accommodate her in these ways and according to Walton, he changed her assignments to tasks he knew would be difficult for her given her health problems.  It is unclear from Walton's own testimony if this failure to accommodate on the part of Conklin began as soon as he became her supervisor in August of 2006 or if it only began after the two conversations in September

of that year, which conversations she characterized as sexual overtures that she rebuffed.

Walton does not allege that anyone other than Conklin ever made any sexual comments to her, propositioned her, or told any inappropriate jokes or stories in her presence. She states generally that Conklin threatened her job "many times."  After a female employee had been fired, Conklin remarked to Walton that he thought a woman should do anything so that they could keep their job.  Walton perceived this to be a veiled reference of a sexual nature.  She also avers that on one occasion in October of 2006, Conklin stared at her for an entire shift.  The real meat of her sexual harassment claims, however, arise out of two conversations with Conklin in September of 2006.

On September 14, 2006, Walton was sitting and working in the "zest room" when Conklin entered the room and approached the desk where she was working.  He pulled up the crotch of his pants in a way she found sexually suggestive and sat on the corner of the desk with his crotch two feet in front of her face.  He started talking to Walton about his wife and explained that she had multiple sclerosis ("MS"), a condition which Walton's doctors had told her might be causing some of her problems.[3]  Conklin told Walton that his wife did not enjoy sex and that she had no feeling and he pointed to his crotch.  He asked Walton if she knew what he was speaking of as far as being MS and not having those sensations.  She replied that she had no idea and turned and left the room.

---

[3]  Eventually, the doctors ruled out the MS diagnosis for Walton, but at this time she believed it was possible that she was going to be diagnosed with this condition.

On September 18, 2006, Conklin approached Walton near one of the machines that she operated.  He said "in reference to that conversation we had the other day, did you understand what I meant?  What I meant is, my wife doesn't have any feeling in her privates and she doesn't enjoy me to touch her there."  Another Neptune employee walked up and Conklin left to attend with that employee.

There is no other evidence before this Court of any other statements or conversations by Conklin to Walton of a sexual nature.  Walton contends that there was talk at Neptune that Conklin had propositioned Beverly Johnston's sister, then a Neptune employee.  While Walton has no evidence of any "sexual" harassment by Conklin, she believes that her failure to favorably respond to what she considered a sexual overture caused Conklin to begin a campaign to get her fired or subjected to disciplinary action.  Walton admits that she did not report Conklin's conduct to anyone in a position of authority with Neptune.

On Wednesday, September 20, 2006, Walton fell on a slippery area of floor while at work.  She injured her wrist and hand.  A doctor completed a work status report on September 21, 2006. The doctor released her to work with restrictions for four days.  The restrictions included no lifting, carrying, pushing or pulling and limited stooping and bending.

On Thursday, September 28, 2006 at around 4:30 p.m., Conklin told Walton that she needed to pick a mold machine and clean it from top to bottom.  She asked him why, and he told her that it needed to be done.  Walton perceived this request as punishment.  According

to Walton, Conklin had falsely accused her of "reading" on this date and required her to clean a large machine as punishment. Mike Hornsby ("Hornsby") was present when Conklin told Walton to clean a mold machine. Later that evening, Hornsby asked Walton which machine she had chosen. Walton replied that she was not going to clean any machine because it was not her responsibility. Hornsby told Walton that she probably should do as Conklin asked because he had heard Mike Granger ("Granger"), the Production Manager, ask Conklin to have her clean one of the molding machines. Walton expressed further dissatisfaction with having been assigned the task, but went and obtained cleaning supplies. Walton testified that she actually cleaned the machine after having questioned why the task had been assigned to her. She offers no testimony concerning how long the task took. Hornsby and Conklin did not think that she cleaned the whole machine and told human resources about the incident noting that after only a few minutes of cleaning she went off to "pout." Conklin reported this incident to Granger who also spoke with Hornsby regarding the incident. Granger and Fulmer met with Walton regarding this incident on October 3, 2006.

On October 4, 2006, Human Resources Director Stephanie Fulmer ("Fulmer") called Walton in to discuss the September 28, 2006 issue. After hearing Walton's version of the events, Fulmer told Walton she would look into the matter further and that there might be repercussions from it. Walton heard nothing further from Fulmer about the matter.

On or slightly before October 12, 2006, Conklin reassigned Walton to a position on the production line. This position did not allow her to rest her feet and legs by sitting. She

asked Conklin on October 12, 2006 to be allowed to rotate into another position, but he denied her request. Walton began to ask cow-worker Beverly Johnston ("Johnston") to rotate positions with her. According to Johnston, Walton was harassing her. Johnston complained to Conklin about Walton's harassment at around 9:00 p.m. on October 17, 2006. According to Johnston, Walton had started asking Johnston to switch jobs with her on October 16, 2006. Johnston claimed that Walton was purposely holding up production on Johnston's part of the line. Conklin told her that if she was tampering with production she could be fired. Walton denied having done so. Conklin instructed Walton to stay out of Johnston's area and to focus on her own job. According to Walton, Conklin told her not to talk to Johnston anymore.

While he was her supervisor, Conklin was frequently critical of Walton's work performance. On October 24, 2006, Conklin told Walton that there was a small crack in the main cases. According to Walton he accused her of being responsible for that problem getting through the line. On October 25, 2006, Conklin accused Walton of holding up the line. On November 1, 2006, Conklin accused Walton of failing to appropriately test the waters at the wash station.

On October 27, 2006, Walton left work early because she was sick. After Walton left work early, Conklin encountered her outside Wal-Mart and demanded what she was doing there.[4] She told him she was getting some medicine. Conklin was skeptical of Walton's

---

[4] Walton assumes that because Conklin was there at that time he must have followed her, but there is no actual evidence of this in the record nor is it a reasonable inference from the simple fact that they were there at the same time.

claim that she was ill.  He asked other employees if she was really sick.  He sent an email message to Fulmer reporting that he had seen Walton in front of Wal-Mart after she left work sick and stating that she frequently claims to be sick on most Fridays.

## C.  Events Resulting in the Termination of Walton's Employment

Neptune terminated Walton's employment on November 30, 2006.[5]  There is a great deal of information before the Court from a variety of sources regarding the events during the end of the second shift at Neptune from November 27, 2006 through November 29, 2006.  Some witnesses contradict each other.  For purposes of resolving this motion, the Court will view the facts in the light most favorable to Walton and abstain from attempting to resolve any disputes as to material fact.  That being said the Court will summarize the various accounts here in the factual recitation noting where they are in conflict.

On the morning of November 27, 2006, Walton had a medical procedure and was not in good shape.  She was experiencing some bladder problems and her knee was swollen.  Nevertheless, she went to work.  Once at work on the line, she asked Conklin to go and get her an Ace bandage.  Conklin did so.  During his trip to the nurse's station he also retrieved

---

[5]  At the time of the termination of her employment, Walton was 52 years old.  Currently, about 25% of Neptune's employees are 52 years of age or older.  At the time Neptune discharged Walton approximately 135 of its employees were 52 years of age or older.  Walton testified in her deposition about the ages of the other employees, but gave no indication that she had personal knowledge concerning the actual age of other Neptune employees.  Her testimony is plainly based on her impression or guess regarding the ages of co-workers.  Moreover, she admitted that a number of the first shift employees were older and had worked for Neptune for many years.

some medicine for another worker, Alisha Moore ("Moore") who was having cramps. Walton admits that her bladder problems caused her to have to make several visits to the bathroom during this shift.

On November 27, 2006, near the end of the second shift at 11:10 p.m., but while the second shift employees were still "on the clock," Rhonna Funderburk ("Funderburk"), a lead employee from third shift, heard Walton in the bathroom tell two other second shift employees "we can hide in the bathroom.  He can't come in here."  Next Walton said "Ed will send Rhonna in here because he has done that before."  When Funderburk left the bathroom she reported what she had seen and heard to Henderson.  She also sent him an email very early on November 29, 2006 documenting the incident.  At 2:35 a.m. on November 29, 2009, Henderson forwarded Funderburk's email message along with one of his own confirming that he had seen Walton leave the bathroom at 11:25 p.m. on that night to Conklin, Fulmer, and other members of the management team.  In his affidavit, Henderson reiterates that he saw Walton and the other employees leave the bathroom at 11:25 p.m. on November 27, 2006.

On November 28, 2006, production finished early, and Walton had completed all of her cleanup work.  Walton asked Conklin what he would like them to do as they had finished early.  She avers that Conklin replied: "Out of sight, out of mind.  If I was [sic] you, I'd go to the bathroom."  Walton, Moore and another employee Victoria Roberts ("Roberts") went to the bathroom.  Walton went into a stall and then came out and washed her hands.  Roberts

then said that with all three of them in there at the same time "they" (presumably management) were going to think that "we" (Walton, Moore and Roberts) were avoiding work.  Moore and Roberts said they were going to stay in the bathroom.  While Walton was washing her hands, Funderburk, a third shift lead person who had been in a bathroom stall, exited the stall.  Walton went out on the floor to look for her badge because she had realized her badge was missing.  As she left the bathroom, she passed right in front of Funderburk. Walton states that she was only in the restroom between 11:19 and 11:24 p.m. and that two other workers were also in there during that time.  Eventually, Walton found her badge and clocked out late.

According to an email message from Conklin dated November 29, 2006 at 11:50 p.m.,[6] production stopped at 11:00 p.m. on that date and the second shift employees were cleaning and performing required checks, except for Walton who could not be located. Conklin searched for her and decided that she was hiding in the bathroom again.  He watched that area for awhile and eventually asked an employee named "Lynn" to go in and see who was in the bathroom.  Lynn did as requested and then reported to Conklin that Walton and Moore were in there.  At 11:20 p.m., Conklin saw Walton and Moore come out of the bathroom.  Based on this incident, Conklin recommended that Neptune terminate Walton's

---

[6]  Conklin is no longer a Neptune employee.  Neither party has presented any sworn testimony from Conklin in the form of an affidavit or deposition testimony.  For purposes of his motion, the Court considers the copies of his email predicated upon the assumption that these documents convey information capable of being rendered admissible without making any finding as to the admissibility of the emails at trial.

employment.  He explained that in his view she was not a team player and had repeatedly had trouble following instructions and performing required tasks.  Conklin identified seven different company rules he believed Walton had violated.

Moore's testimony provides a conflicting account of the events of November 28, 2006.  Moore claims that she went to the bathroom that evening and when she entered the bathroom Walton was already there.  Moore claims that Roberts entered the bathroom after she did.  Once Moore and Roberts were in the bathroom, Moore contends that Walton stated that they could hide in the bathroom and the supervisor would not be able to find them.  This seems very similar to the description of events Funderburk places on November 27, 2006. It is not clear who is mistaken about the date or on how many instances Walton was observed in the bathroom at the end of her shift.  In her testimony, Walton denies making any statement about hiding out in the bathroom or staying in the bathroom.  Additionally, Walton denies having stayed in the bathroom to avoid work on other occasions.  She admits that an employee named Osteen had been sent in to check on Walton on a prior occasion when she was in the bathroom.

Fulmer prepared a letter dated November 30, 2006, which informed Walton that her employment was being terminated effective immediately.  The letter indicated that on two occasions Walton had been observed in the restroom for extended periods of time at the end of her shift rather than in her assigned work area.  The letter further indicated that both incidents occurred after she had been warned on November 27, 2006 that the overlap time

13

between shifts was not free time, but rather a time to clean and perform "TPM checks." When Walton arrived at work on November 30, 2006, Fulmer called Walton to her office. Fulmer, Conklin, and another member of management were present for this meeting with Walton.  Fulmer told Walton that the meeting was concerning an incident on the 27th in the restroom and that they had learned she had been hiding in the restroom.  Walton denied having done so.  Fulmer told Walton she was being insubordinate.  Fulmer told Walton that Walton had been warned previously.  Walton asked to see the warnings.  Fulmer said they were in her file.  According to Walton, Fulmer did not show her any paperwork, but instead repeatedly asked Walton to turn in her badge and leave.  Walton turned to Conklin's boss, who was present, and said "there are things that you need to know that he's doing and he is doing things that are not right."  Fulmer repeated her request that Walton submit her badge and leave.  Walton gave Fulmer her badge.  Conklin escorted Walton to her locker and then out to the parking lot.

Joe Breeding ("Breeding"), the Vice President of Human Resources at Neptune, has provided this Court with sworn testimony that he is the person at Neptune with final authority with regard to hiring and firing decisions.  Breeding states that he made the decision to terminate Walton's employment after he learned of the incident in which Walton had been reported to have been hiding in the restroom to avoid work.[7]  He further contends that

---

[7] Because of the lack of specificity in Breeding's affidavit, it is not entirely clear to the Court which incident or incidents triggered his decision to terminate Walton's employment.  It appears that he may be referring to the November 27, 2009 incident that

Conklin's recommendation that Walton be fired is not what caused him to determine that she should be fired, but rather, his decision came as a result of his own determination that Walton had violated company rules. Specifically, he contends Neptune's investigation of reports of misconduct by Walton from employees other than Conklin revealed that more than one employee stated that Walton had not only hidden in the bathroom but had made a comment about hiding in the bathroom.

## D. Neptune's Policies

Like many employers Neptune has policies which prohibit workplace discrimination and harassment whether that harassment be sexual or of another sort. Neptune provides written versions of these policies to its employees. Walton received a copy. Additionally, Roper Industries, Inc. ("Roper") [8] had a hotline, which was publicized at the Neptune facility, for the reporting of inappropriate behavior or ethics violations. Neptune also has a disciplinary policy which provides for progressive discipline for the violation of certain company work rules. The first step is a counseling session by the supervisor. While the first warning may be verbal, a written notice of the counseling should be submitted to the human resources department for placement in the employee's file. A second violation in a year results in a formal written warning. A third violation in a year results in a three day

---

Funderburk described in the November 29, 2006 email message. It was in that message that Funderburk claimed that she heard Walton encouraging other employees to join her in hiding in the bathroom. This is a fact that Breeding references.

[8] Roper is Neptune's parent corporation.

suspension and a final written warning.  Any further violations in a year result in discharge.

The company reserves the right to immediately discharge employees in more serious cases

or to deviate from the policy when there are extenuating circumstances.  Other work rule

violations are listed in the disciplinary policy are more serious offenses warranting

suspension or discharge.  This more serious list includes: "sleeping on the job or hiding for

the purpose of avoiding work."

**E.  Disciplinary Action Against Other Employees**

Neptune did not terminate the employment of Moore and Roberts.  Conklin told

Fulmer that they were both hard workers.  He also told Fulmer that he believed that neither

of them stayed in the bathroom as long as Walton and that Roberts had told him earlier that

she had been having female problems and stomach cramps.  He told Fulmer that he had

verbally reprimanded Moore and Roberts.

**F.  Walton's Unemployment Compensation Claim**

After the termination of her employment, Walton sought unemployment

compensation.  In response to her claim, the State of Alabama Department of Industrial

Relations ("the ADIR") requested information from Neptune about the termination of her

employment.  Neptune responded that it had employed Walton until November 30, 2006, but

that she was discharged due to an incident on November 29, 2006 in which she violated work

rules by hiding in the restroom to avoid work.  Neptune further contended that Walton had

been previously warned about the inappropriateness of this type of conduct on November 27,

16

2006.  Under Section 25-4-78(3)(b), an employee discharged from a position for misconduct at work after having previously been warned is not entitled to unemployment compensation. The ADIR awarded Walton unemployment compensation benefits.  After having conducted an evidentiary hearing, the ADIR determined that Walton was absent from work on November 26, 2006, the date on which the supervisor gave a general counseling to all employees regarding the requirement to continue working and not to leave their assigned areas.  Because it found that she had not previously been warned against the misconduct for which she was discharged, it found that § 25-4-78(3) did not apply and she was entitled to the unemployment compensation payments she sought.  The ADIR Administrative Hearing Officer mentioned that Walton denied having engaged in the conduct for which she was discharged, but did not make a finding to award benefits on the basis of that denial, rather its finding was based on the failure of Neptune to demonstrate that she had been warned not to engage in the misconduct for which it terminated her prior to discharging her.

## PROCEDURAL HISTORY

On March 5, 2007, Walton filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  In her charge, Walton complained of discrimination due to her sex, age, and disability, as well as retaliation.  The EEOC issued a Dismissal and Notice of Rights on October 3, 2007.  Walton filed this lawsuit on January 2, 2008.  In this lawsuit, she seeks damages, declaratory relief, injunctive relief, attorney's fees, and costs.  She alleges a violation of Title VII arising out Conklin's sexual harassment

17

of her.  She alleges age discrimination in violation of the ADEA.  She alleges disability

discrimination in violation of the ADA.[9]  Finally, Walton alleges retaliation against her after

she has exercised her statutory rights.  Notably, the Complaint fails to specify under which

statutory or statutes the retaliation claim is made.  Although the Complaint alludes to claims

pursuant to Alabama law in the introductory paragraphs, none are actually set forth in the

allegations of the Complaint.

Neptune and Roper have sought summary judgment on all of Walton's claims.

Walton responds by opposing this motion.  In so doing, she sheds additional light on the

specific nature of her claims in this action.  She elaborates on the incidents with Conklin in

support of her sexual harassment claim.  She explains the nature of her disabilities during her

employment with Neptune and complains that while prior supervisors had accommodated

her, Conklin refused to do so and in fact, assigned her to tasks he knew she could not perform

without pain.  She contends that the termination of her employment was discriminatory

because other employees who were not as old or who did not have a disability engaged in the

same conduct she did, but were not fired or even disciplined.  She also denies engaging in

the conduct for which Neptune fired her.  As for her claim of retaliation, Walton specifies

that she had no problems at Neptune until after she rebuffed Conklin's sexual advances.  She

_____

[9] In the Complaint, Walton alleges that "Calhoun had an actual or perceived disability and was denied an employment opportunity and terminated from a position she was already performing.  Calhoun was refused employment due to her disability and Defendant's perception that Plaintiff was disabled."  Compl. at ¶ 37.  The Court is at a loss to understand how those allegations relate in anyway to the fact of this case.

attributes all of her problems with Conklin after his overtures to his desire to retaliate against her for rejecting him and ultimately to see her get fired. Walton also faults Fulmer for failing to follow Neptune's own progressive discipline policy and failing to properly inquire into the allegations made against Walton after Walton denied the charges against her.

## DISCUSSION

### A.  Claims Against Roper

It is unclear from the Complaint itself whether Walton is attempting to hold both Neptune and its parent company Roper liable.[10]  To be sure both entities are identified in the section of the caption where the defendant's name is to be placed.  Walton alleges that Neptune employed her, but further states that Roper is the parent company of Neptune and identifies the number of employees it employs.  Compl. at ¶¶ 3 & 4.  Walton sought service of both Neptune and Roper.  Due to this ambiguity, Roper has joined in the Neptune motion for summary judgment arguing that it cannot be held liable under the applicable law.  Walton makes no effort to refute this argument or to address whether she intended to state a claim against Roper as well as against Neptune.  Consequently, the Court lacks both a factual and a legal predicate upon which to base any finding of liability against Roper.  For this reason, the motion for summary judgment is due to be GRANTED to the extent that it seeks judgment as a matter of all as to all of Walton's claims against Roper.  This preliminary issue

---

[10]  At the Pretrial Conference, counsel for Walton appeared to concede that there were no viable claims against Roper.

having been addressed, the Court will not address Walton's remaining claims against her employer, Neptune.

**B. ADEA Claim**

The ADEA makes it "unlawful for an employer...to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

> When a plaintiff alleges disparate treatment, 'liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision. That is, the plaintiff's age must have "actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 141 (2000) (quoting *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610 (1993). The courts have often recognized that this inquiry implicates analyses of the mental processes of employers for which there is seldom eye-witness testimony. *Id.* Consequently, the courts have applied some variation on the framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and its progeny to analyze ADEA cases brought primarily on circumstantial evidence. *Reeves,* 530 U.S. at 141 (collecting cases); *Turlington v. Atlanta Gas Light Co.,* 135 F.3d 1428, 1432 (11th Cir.), *cert. denied,* 525 U.S. 962 (1998). Thus, an employee bringing a claim under the ADEA must initially establish a *prima facie* case of discrimination through one of three methods: by presenting direct evidence of discriminatory intent, presenting circumstantial

20

evidence of discrimination by satisfying the analysis set forth in *McDonnell Douglas* and its progeny, or by introducing statistical evidence of discrimination. *See, e.g., Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1556 (11th Cir. 1995).[11]

To establish a discrimination claim by circumstantial evidence using the *McDonnell Douglas* framework, the employee has the initial burden of showing, by a preponderance of the evidence, a *prima facie* case of the proscribed practice. *Young v. General Foods Corp.,* 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied,* 488 U.S. 1004 (1989). The essence of the *prima facie* case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference by the fact finder that the employer used prohibited criteria in making an adverse decision about the employee. If established, the *prima facie* case raises a rebuttable presumption that the employer is liable to the employee. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981). "Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997).

Once  a plaintiff establishes the requisite elements of the *prima facie* case, the defendant has the burden of producing a legitimate, non-discriminatory reason for the challenged employment action. *See, e.g., Holifield v. Reno,* 115 F.3d at 1564 (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981)). The employer's burden is

---

[11]   Walton offers no evidence that could be appropriately considered direct or statistical evidence of age discrimination. Accordingly, the Court will limit its discussion to her circumstantial evidence.

"exceedingly light." *Holifield,* 115 F.3d at 1564. This burden is one of production, not persuasion and consequently, the employer need only produce evidence that could allow a rational fact-finder to conclude that the challenged employment action was not made for a discriminatory reason. *See, e.g., Davis v. Qualico Miscellaneous, Inc.,* 161 F. Supp. 2d 1314, 1321 (M.D. Ala. 2001).

If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. *See, e.g., Holifield,* 115 F.3d at 1565; *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997) (plaintiff "has the opportunity to discredit the defendant's proffered reasons for its decision"). Thus, once the employer articulates a legitimate, non-discriminatory reason, the burden returns to the employee to supply "evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Davis,* 161 F. Supp. 2d at 1322 (citing *Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*)). The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256; *Combs,* 106 F.3d at 1528. A plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to

conclude that the employer unlawfully discriminated.  *Reeves,* 530 U.S. at 148.

In this case, Walton claims that the termination of her employment was discriminatory[12] because Neptune did not terminate the employment of the two younger women employees who stayed in the restroom in the same incident or incidents[13] which gave rise to the termination of Walton's employment.

> A plaintiff's prima facie case for a discharge-discrimination claim must show the following elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position at issue; (3) the plaintiff was discharged despite his qualification; and (4) the plaintiff was subject to differential treatment, that is, he was either (a) replaced by someone who was not a member of the plaintiff's protected class or (b) a similarly situated employee who was not a member of the protected class engaged in nearly identical conduct and was not discharged.

*Keel v. U.S. Dep't of Air Force*, 256 F. Supp. 2d 1269, 1285 (M.D. Ala. 2003), *aff'd without opinion*, 99 Fed. Appx. 880 (11th Cir. Mar 02, 2004); *Davis v. Qualico Miscellaneous Inc.,* 161 F. Supp. 2d 1314, 1319 (M.D. Ala. 2001).  *Accord, Williams v. Motorola,* 303 F.3d 1284, 1293 (11th Cir. 2002).  Importantly, an employee cannot establish a *prima facie* case of discrimination by simply arguing that he belonged to a protected class and that he did not

---

[12]  As will be discussed later, Walton also claims that the termination of her employment was motivated by a desire to retaliate against her for her exercise of her rights under the ADA and for refusing Conklin's sexual advances.

[13]  The exact events relating to the hiding in the bathroom are replete with disputed issues as to material facts.  Due to the procedural posture of this case, the Court cannot and will not attempt to resolve those disputes or make credibility determinations.  Unfortunately, even the affidavit from Breeding, the person alleged to have decided to terminate Walton's employment, fails to clearly explain the precise basis for this decision.

engage in the conduct for which he alleges his employment was terminated. *See, e.g., Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1311 (11th Cir.), *superseded in part on denial of reh'g,* 151 F.3d 1321 (11th Cir. 1998)[14]; *Keel,* 265 F. Supp. 2d at 1285; *Thomas v. Ala. Council on Human Relations, Inc.*, 248 F. Supp. 2d 1105, 1119 (M.D. Ala. 2003); *Cooper v. Diversicare Mgmt. Servs. Co.,* 115 F. Supp. 2d 1311, 1318-19 (M.D. Ala. 1999).

There is no dispute in this case that Walton is a member of a protected class in that at the time of the termination of her employment she was more than forty years of age. Indeed, in this case there is no dispute that Walton was a member of that protected class of persons over forty years of age at the time Neptune hired her, as well as at the time of her discharge. There is no dispute in this case that Walton was qualified for the position which she held with Neptune and that she was discharged despite this qualification. Walton does not attempt to establish a *prima facie* case by showing that Walton was replaced by someone who was younger than forty. Instead, she denies having engaged in the conduct for which she was terminated[15] and points to two employees she contends are similarly situated except for the fact that they were under forty years of age, who engaged in what she argues was nearly identical conduct and were not discharged.

---

[14]     The Eleventh Circuit Court of Appeals withdrew part of its opinion in this case on rehearing and substituted a new section which can be found at *Jones v. Bessemer Carraway Med. Ctr.,* 151 F.3d 1321 (11th Cir. 1998). Nothing in this Memorandum Opinion is based on the portion of the opinion in *Jones* which was withdrawn on rehearing.

[15]   Walton denies ever hiding to avoid work and denies encouraging others to hide in order to avoid work.

In evaluating this claim, the Court must be mindful of the binding precedent from the Eleventh Circuit Court of Appeals which requires Walton to be similarly situated in all relevant respects to those comparators she identifies. *See, e.g., Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005) (doctor discharged from clinic due to patient complaints about his conduct who couldn't show that he was replaced by someone outside his protected class and who couldn't show that a comparable person outside his protected class received "nearly identical" complaints, but was not fired failed to establish a prima facie case); *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1259 (11th Cir. 2001) (reversing judgment in favor of plaintiff because employer entitled to judgment as a matter of law where plaintiff's comparator engaged in fewer instances of misconduct than plaintiff); *Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir. 1999) (affirming summary judgment in employer's favor where alleged misconduct of comparators was not sufficiently similar to support disparate treatment claim); *Holifield v. Reno,* 115 F.3d 1555, 1563 (11th Cir. 1997) (affirming summary judgment where plaintiff failed to produce sufficient evidence that non-minority employees with which he compares his treatment were similarly situated in all aspects, or that their conduct was of comparable seriousness to the conduct for which he was discharged); *Jones v. Gerwens,* 874 F.2d 1534, 1540-42 (11th Cir. 1989); *Nix,* 738 F.2d at 1185-87 (African-American plaintiff who was replaced by another African-American after termination for violation of work rule failed to make out a prima facie case of race discrimination because he did not meet his burden of showing that a white employee in

similar circumstances was retained while he was fired).  In evaluating the similarity of the comparators identified by the plaintiff, the most important variables in a discriminatory discipline case are the nature of the offenses committed and the nature of the punishments imposed.  *See, Jones v. Gerwens,* 874 F.2d at 1539.  Both the "quantity and the quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples and oranges." *Maniccia,* 171 F.3d at 1368.  In making this analysis a court must keep in mind that "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules[.]" *Id.* at 1369.  Moreover, the actions of the employer toward the proffered comparators are only relevant if the decisionmaker knew of the rule violations by the comparators and took no action against them.  *Jones v. Gerwens,* 874 F.2d at 1542.

It is undisputed that Neptune terminated the employment of Walton.  It took this action after Funderburk, Henderson, and Conklin reported to management that Walton, Moore, and Roberts was hiding in the restroom to avoid work and that Walton was exhorting others to do the same.[16]  It is undisputed that hiding to avoid work is a serious work rule infraction that can result in discharge under Neptune's disciplinary policy.  It is undisputed that Neptune did not terminate the employment of two women younger than forty years of

---

[16]  Walton denies having stayed in the restroom as long as Moore and Roberts did. She also denies exhorting the others to stay in the restroom to avoid work and attributes a comment about staying in the bathroom so their supervisor could not find them to Roberts.

age, Moore and Roberts, who were also spotted in the restroom at the same time as Walton. Instead, Neptune allowed Conklin to merely give them an oral reprimand.

When the Court views the evidence in the light most favorable to Walton and refrains from attempting to resolve the extant genuine issues of material fact, the Court must find that Walton has offered sufficient evidence from which a reasonable jury might find of a *prima facie* case of age discrimination in that similarly situated employees who were not more than forty years of age engaged in nearly identical conduct and were not discharged.

Once the plaintiff establishes a prima-facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997); *Davis,* 161 F. Supp. 2d at 1321. The employer's burden is "exceedingly light." *Id.* This burden is one of production, not persuasion and consequently, the employer need only produce evidence that could allow a rational fact-finder to conclude that the challenged employment action was not made for a discriminatory reason. *See, e.g., Davis,* 161 F. Supp. 2d at 1321. Neptune has done this by showing that it decided to terminate Walton's employment because Breeding believed that she was the one who had hidden in the bathroom and exhorted others to do so and because Breeding believed that this was not the first time that Walton had engaged in such conduct.[17]

---

[17] Certainly there is evidence of this in the letter Neptune produced which articulates the reasons for the termination of Walton's employment. Again, Breeding's affidavit is not nearly as clear about the reasons for the decisions, but he does indicate that he believed she

Once the employer offers this legitimate, non-discriminatory reason, the burden returns to the employee to supply "evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Davis,* 161 F. Supp. 2d at 1322 (*citing Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*)).  Where an employer has subjected an employee to disciplinary action or terminated the employment of the employee for misconduct, the employee may show that the employer's proffered reason is pretextual by setting forth evidence that other employees, not within the plaintiff's protected class, who engaged in similar acts were not similarly treated. *Davis,* 161 F. Supp. 2d at 1322.

Some cases suggest that a plaintiff in these circumstances may also establish pretext by showing that the employer's proffered reasons have no basis in fact because the employee did not engage in the conduct on which the employer acted.  *See, e.g., Anderson v. Savage Labs., Inc.,* 675 F.2d 1221, 1224 (11th Cir. 1982) (noting this means of proof in *dicta* in a case where employee conceded that he had violated the work rule on which his termination was based); *Davis,* 161 F. Supp. 2d at 1322 (*citing Anderson* in overview of paradigm).

Other cases suggest that reliance on this method of proof of pretext is "problematic."

---

had been hiding to avoid work and telling other employees that they could hide to avoid work.  While it is clear that part of the reason Breeding reached this conclusion was the information he received from Conklin, it is also clear that Breeding also relied on information received from other employees.

*Cooper,* 115 F. Supp. 2d at 1319 (*citing Walker v. NationsBank of Fla.,* 53 F.3d 1548, 1564

(11th Cir. 1995) (Johnson, J., specially concurring).

> Evidence showing a false factual predicate underlying the
> employer's proffered reason does not unequivocally prove that
> the employer did not rely on the reason in making the
> employment decision.  Instead, it may merely indicate that the
> employer, acting in good faith, made the disputed employment
> decision on the basis of erroneous information.  It is obviously
> not a violation of federal employment discrimination laws for an
> employer to err in assessing the performance of an employee.
> Thus, establishing pretext is not merely demonstrating that the
> employer made a mistake, but that the employer did not give an
> honest account of its behavior.

*Id.* (internal citations omitted).  Rather than simply disputing whether she engaged in the

conduct at issue, the employee could establish pretext by "presenting evidence tending to

show that the predicate facts underlying the proffered reason were false" *and* that "the

employer knew them to be false at the time of [its] purported reliance" or that "the proffered

reason may involve a disputed fact of a kind that it is improbable that the employer could be

mistaken about it."  *Walker,* 53 F.3d at 1564 n.7; *Cooper,* 115 F. Supp. 2d at 1320.

In order to show that the proffered reason for the termination of Walton's employment

was pretextual, Walton must show that Breeding based his decision to discharge her on an

unreasonable belief that Walton hid in the restroom to avoid working at the end of her shift

and exhorted other employees to do the same.  *See, e.g., Silvera v. Orange County Sch. Bd.*,

244 F.3d 1253, 1261 (11th Cir. 2001), *cert. denied,* 122 S. Ct. 402 (2001) (pretext means

more than a mistake by the employer; actions taken based on a mistaken, non-discriminatory

belief do not violate Title VII); *Lee v. GTE Fla, Inc.,* 226 F.3d 1249, 1253 (11th Cir. 2000), *cert. denied,* 532 U.S. 958 (2001) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken, but that were in fact motivated by [the protected characteristic]."); *Equal Employment Opportunity Comm'n v. Total Sys. Servs., Inc.,* 221 F.3d 1171 (11th Cir. 2000) (plaintiff could be properly discharged on defendant's good faith belief that she lied in an internal investigation); *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1339 (11th Cir. 2000), *reh'g denied,* 218 F.3d 749 (11th Cir. 2000) ("a plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race."); *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991) (court's pretext inquiry is properly limited to whether the decision-makers believed the employee had engaged in conduct for which he was terminated and if so whether this belief was the reason for the discharge, not whether plaintiff was actually guilty of the conduct); *Connor v. Fort Gordon Bus Co.,* 761 F.2d 1495, 1501 (11th Cir. 1985) (employer's belief, honest but mistaken, may nonetheless provide legitimate reason for discharge).

With respect to her age discrimination claim, Walton offers little evidence or argument beyond the facts offered in support of the *prima facie* case to establish pretext. Walton has failed to present any evidence from which a reasonable factfinder could find that Breeding did not really believe that Walton had hidden in the restroom to avoid work and

encouraged others to do the same.  Indeed, more than one Neptune employee[18] had reported to higher management that Walton had done both prior to the decision to terminate her employment.  Walton has not presented any evidence from which a reasonable factfinder could find that Breeding decided to terminate her employment because of her age.  Walton has failed to present evidence from which a reasonable factfinder could call into question Breeding's determination that the other employees had engaged in less serious conduct warranting a lesser punishment.  In the absence of these types of evidence, Neptune is entitled to summary judgment on Walton's ADEA claims alleging that the termination of her employment was age discrimination.  Neptune's motion is due to be GRANTED as to Walton's claims pursuant to the ADEA.

## C. Title VII Claims

### 1. Sexual Harassment

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  It has long been recognized that "[t]he phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)

---

[18]  There is no evidence that this employee, Funderburk, was connected in any way to Conklin.

(internal citations omitted).

While Walton originally alleged that she was discriminated against on the basis of her sex because while she was employed with Neptune her supervisor subjected her to sexual harassment, she has subsequently abandoned these claims.[19]  For this reason, Neptune's motion for summary judgment is due to be DENIED as MOOT.

### 2.  Retaliation

In addition to prohibiting discrimination on the basis of sex, Title VII also contains provisions which prohibit retaliation against employees who engage in certain protected conduct.  Under Title VII, it is also an unlawful employment practice for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participate in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Walton alleges that Conklin retaliated against her after she rebuffed his sexual advances.

As previously stated, Walton's final federal claim against Neptune is brought pursuant to Title VII for what she alleges was retaliation against her.  Specifically, Walton contends that rebuffing or rejecting what she believed to be Conklin's sexual overtures towards her resulted in Conklin causing the termination of Walton's employment.

---

[19]  Walton's counsel specifically relinquished them at the pretrial conference and amended her contentions for the pretrial order to omit any reference to such claims.

The analysis of a claim of retaliation based on circumstantial evidence[20] is similar to the analysis of a discrimination claim based on circumstantial evidence.

> To establish a prima facie case of retaliation, [an employee] must show: (1) she engaged in protected activity; (2) her employer was aware of that activity; (3) she suffered adverse employment action; and (4) there was a causal link between her protected activity and the adverse employment action.

*Maniccia v. Brown,* 171 F.3d 1364, 1369 (11th Cir. 1999) (*citing Little v. United Tech.,* 103 F.3d 956, 959 (11th Cir. 1997)).  *Accord, Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir. 1998) (citations omitted).  Neptune does not challenge Walton's contention that the evidence supports the first three elements of the *prima facie* case, and the Court accepts Walton's assertion that they are established for purposes of this motion.[21]

As is common in these types of cases, the real issue with respect to Walton's *prima facie* showing on her retaliation claim is the fourth element which requires a showing of a causal link between the alleged adverse employment action and the protected activity.  "The causal link element is construed broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'"

---

[20]  There is no direct evidence of retaliation in this case.

[21]  This is not inconsistent with the Court's finding that Walton was not sexually harassed.  Even if Conklin's treatment of Walton was not a violation of Title VII, Walton could have engaged in protected expression by opposing it if she establishes that she had a good faith and reasonable believe that Conklin's conduct was unlawful.  "To establish that a plaintiff engaged in statutorily protected expression, ... a plaintiff must show that she 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311 (11th Cir. 2002).

*Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001) (citations omitted).  One common method of establishing the causal link element is close temporal proximity between the adverse employment action and the protected activity.  Of course, this is not the sole means of establishing the causal link element; rather it is merely the most commonly used approach.  Indeed, the close temporal proximity between Walton's rejection of Conklin and the events resulting in the termination of Walton's employment less than three months later, is sufficient circumstantial evidence to satisfy the requirement that Walton have evidence of all the elements of the *prima facie* case of retaliation.

If the plaintiff establishes a *prima facie* case of  retaliation, the burden then shifts to the employer to rebut the presumption by articulating legitimate, non-retaliatory reasons for its employment action.  *See, e.g., Holifield v. Reno,* 115 F.3d 1555, 1564 (11th Cir. 1997); *Olmsted*, 141 F.3d at 1460.  "This intermediate burden is exceedingly light." *Id*. (internal quotations omitted).  The employer has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced.  *See McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973); *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253-255 (1981).

The provisions in Title VII against retaliation are designed and intended to prevent employers from improperly punishing employees who have exercised their right to engage in protected conduct.  These provisions are not intended to insulate an employee from discipline for violating the employer's rules or disrupting the workplace.

34

Once the employer satisfies this burden of production, as Neptune has here, "the presumption of [retaliation] is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citations omitted).  The establishment of a *prima facie* case does not in itself entitle a plaintiff to survive a motion for summary judgment.  *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987); *Pace v. Southern Ry. Sys.*, 701 F.2d 1383, 1389 (11th Cir. 1983).  After an employer proffers non-retaliatory reasons for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered . . . reasons is pretextual."  *Chapman*, 229 F.3d at 1037.

In support of her contention that Neptune's proffered reasons are pretextual again appears to argue that the timing of the events in question constitutes circumstantial evidence of some connection between her protected conduct and her suspension and termination.  Close temporal proximity between protected conduct and an adverse employment decision cannot alone create a genuine issue of material fact on the issue of whether the employer's proffered non-retaliatory reason was pretextual.  *See, e.g., Wascura,* 257 F.3d at 1245; *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1287-88 (11th Cir. 1997); *Padron v. BellSouth Telecomm., Inc.,* 196 F. Supp. 2d 1250, 1256-60 (S.D. Fla. 2002), *aff'd*

35

*without opinion,* 62 Fed. App. 317 (11th Cir. 2003).  *Accord, Tran v. Trustees of State Colls. in Colo.,* 355 F.3d 1263, 1270 (10th Cir. 2004).

Walton argues far more than just the temporal proximity to establish evidence that the reason given was a retaliation for pretext.  She contends that Neptune did not follow its own progressive discipline policy; however given the language of the policy itself, the Court cannot say that is a fair and reasonable inference in this case.  She contends that she never had any disciplinary problems during more than three years of employment until after she rebuffed Conklin.[22]  She notes the great many problems she had with Conklin criticizing her work after she rebuffed him.  She contends that Neptune gave false information about a prior warning having been given to her when it argued against her receiving unemployment compensation.  She contends that Neptune did not ask for or listen to her version of the events and conducted a one-sided investigation.  She points to the involvement of Conklin as a key force in influencing the decision to terminate her employment.[23]  Walton has

---

[22]  This argument is mostly supported by the evidence.  She did have negative comments from a prior supervisor which resulted in a delay in her receiving a raise, but that was very early in her employment.  Nearly all of the negative information in Walton's file came after Conklin was her supervisor.

[23]  Of course, Conklin is the person Walton charges had the motive to retaliate against her because of her rebuff of his sexual advances.  Walton contends and Neptune does not dispute that rebuffing unwelcome sexual advances is protected conduct under Title VII.  This makes Conklin's involvement in sullying Walton's name and trying to get her discharged or disciplined suspect especially in view of the timing of these events.  Because there is no evidence that Conklin or anyone else at Neptune had any bias against Walton because of her age, the analysis is a bit different than that of the Walton's claim that her discharge constituted age discrimination.

presented evidence which if believed establishes that all the workers other than Walton were warned against failing to work during their whole shift on November 26, 2006; that on November 27, 2006, Conklin was aware of a report by another supervisory employee accusing Walton of hiding in the bathroom to avoid work; and that on November 28, 2006, Conklin exhorted Walton to hide in the bathroom at the end of her shift.  Certainly, a reasonable fact-finder could decide based on these facts that Conklin was trying to set Walton up for discharge.  Given that Walton's problems with Conklin follow so closely on the heels of her rejection of him, a reasonable factfinder could determine that he did so to retaliate against her for rejecting him.  Of course, Conklin was not the final decision-maker in the adverse employment action at issue; Breeding was.  The "cat's paw" theory could afford Walton a remedy nonetheless.  If a reasonable factfinder believes that Conklin manipulated events to get Walton in a position of having committed an offense warranting termination and influenced Breeding to take that action and that Breeding did so without conducting a reasonable inquiry into the basis for the conduct, Neptune could be held liable under Title VII for retaliation.  In view of the evidence before the Court,[24] the Court cannot say as a matter of law that Neptune is entitled to summary judgment on Walton's Title VII

---

[24]  The Court notes that Walton offers far more evidence of pretext in support of her two retaliation claims than she does in support of her age discrimination claim. With respect to the retaliation claims, there is evidence of suspect timing and involvement of persons with possible reasons to retaliate against Walton. Thus, while no reasonable factfinder could find that the real reason for the termination of Walton's employment was her age, a reasonable factfinder might find that the real reason for the termination of Walton's employment was illegal retaliation.

retaliation claim.[25]

## D. ADA Claims

### 1. Disability Discrimination

As the Eleventh Circuit Court of Appeals has explained,

> [t]he ADA mandates that covered employers shall not "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the Act, the term "discriminate" is defined to include, among other factors, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4).

*Wascura v. City of South Miami,* 257 F.3d 1238, 1242 (11th Cir. 2001). Given the absence

of the direct evidence to support Walton's disability discrimination claim, as that type of

---

[25] Neptune has argued an alternative ground for summary judgment. It contends that it is entitled to summary judgment even this is a mixed-motive case because it would have made the same decision anyway. It will be for the jury to decide whether legitimate and illegitimate reasons motivated Neptune when it terminated Walton's employment. To the extent that Neptune seeks summary judgment on a mixed-motive defense, its motion is denied, as it has not sufficiently shown that there is no way a reasonable jury could find by a preponderance of the evidence that it would have terminated Walton's employment even in the absence of the impermissible motive. *Pulliam v. Tallapoosa County Jail*, 185 F.3d 1182, 1184 (11th Cir. 1999). Similarly, Neptune's argument that it is entitled to summary judgment on Walton's claims for punitive damages is not inadequate in the circumstances of this case.

evidence has been defined by the Eleventh Circuit Court of Appeals,[26] this Court will analyze this case as one in which the plaintiff relies on circumstantial evidence.  *See, e.g., Wascura,* 257 F.3d at 1242 (applying Title VII burden shifting analysis[27] to case brought pursuant to the ADA based on circumstantial rather than direct evidence).

"To establish a *prima facie* case of discrimination under the [Rehabilitation Act or the ADA], an individual must show that (1) [s]he has a disability; (2) [s]he is otherwise qualified for the position; and (3) [s]he was subjected to unlawful discrimination as the result of [her] disability."  *Sutton v. Lader,* 185 F.3d 1203, 1207 (11th Cir. 1999).  The court notes that some courts have criticized the Eleventh Circuit Court of Appeals' articulation of the third element of the *prima facie* case.  *See, e.g., Boyd v.  Province Healthcare Co.,* 2005 WL 3132394, *4 n.16 (S.D. Ala.  Nov.  22, 2005); *Brandon v.  Lockheed Martin Aeronautical Sys.,* 393 F.  Supp.  2d 1341, 1345-46 (N.D. Ga.  2005).  The Court agrees that the third element of the *prima facie* case is more properly understood as obliging a plaintiff to show that she was subjected to adverse employment action under circumstances suggesting a

---

[26]  A summary of Eleventh Circuit Court of Appeals cases explaining the nature of direct evidence in employment discrimination cases is found in *Wascura,* 257 F.3d at 1242 n.2.

[27]  The United States Supreme Court has set forth a burden-shifting scheme for discriminatory-treatment cases.  Under this scheme, a plaintiff must first establish a *prima facie* case of discrimination.  The burden then shirts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action.  If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment, by offering evidence demonstrating that the employer's explanation is pretextual.  *See, e.g., Raytheon Co. v. Hernandez,* 540 U.S. 44, 49 n.3 (2003).

causal link to her disability.

Once a plaintiff establishes a *prima facie* case of discrimination, the employer must articulate a legitimate, non-discriminatory reason for the challenged action. *See Wascura,* 257 F.3 at 1242. If the employer articulates one or more such reasons, the presumption of discrimination created by the *prima facie* case is eliminated and the plaintiff has the opportunity to come forward with evidence, including the evidence offered in support of the *prima facie* case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *See, e.g., Wascura,* 257 F.3d at 1243.

Neptune contends and Walton has not disputed that Neptune accommodated all work restrictions Walton's doctors imposed including granting her FMLA leave so she could be excused from working more than forty hours per week or at any time on the weekend. Neptune contends and Walton has not disputed that Neptune put her on light duty after a workplace fall in September of 2006. Walton contends that her supervisors had previously made informal accommodations of her health conditions in the way that they assigned tasks, but that Conklin did not do so.[28] She further contends that failure to make reasonable

---

[28] Specifically, Walton contends that Morgan allowed her to work in an area where she would not get overheated and allowed her to rotate to the "sit-down portion" of the job. She also states that he installed a rail on a machine she had difficulty climbing. On the other hand, Walton contends that Conklin knew about her health problems, but did not allow her to sit down, did not grant her request to be rotated to another position, assigned her physically difficult tasks to punish her, and assigned her to a job that required repetitive action.

accommodations for a qualified individual with a disability constitutes sufficient evidence that Neptune subjected her to unlawful discrimination as the result of her disability. *See D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1236 (11th Cir. 2005). Viewing the record before it in the light most favorable to Walton, the Court is compelled to find that a reasonable factfinder could find that Neptune discriminated against Walton by failing to make reasonable accommodations for her conditions, at least after Conklin became her supervisor. Accordingly, Neptune is not entitled to summary judgment on Walton's claim of discrimination pursuant to the ADA.[29]

### 2. Retaliation

Neptune did not move for summary judgment on any retaliation claim other than Walton's retaliation claim pursuant to Title VII. This is understandable given the rather vague and general nature of the allegations of retaliation in the Complaint. Nevertheless, Walton argued in her opposition to Neptune's motion for summary judgment that Neptune subjected her to harassment and ultimately terminated her employment in retaliation for Walton's statutorily protected conduct under both Title VII and the ADA. At the pretrial conference the Court attempted to seek clarification from Walton's counsel as to whether Walton intended to pursue a claim for retaliation under the ADA as well as her claim for retaliation under Title VII. It appeared at that time that Walton intended to pursue both types

---

[29] Neptune merely argues that Walton fails to establish a *prima facie* case on this claim. It does not proffer a legitimate non-discriminatory reason for Conklin's actions. Thus, the Court need not discuss the remaining portion of the burden-shifting analysis.

of claims. The Court clearly advised counsel to review and revise their contentions and gave them a deadline for submitting them to the Court. Walton's counsel did amend her contentions. Walton's revised contentions in the Pretrial Order are as follows:

> Plaintiff contends that she was discriminated [sic] on the basis of her disability which was well known by the company, discriminated against on the basis of age, in that she was fired while younger women identically accused were not terminated or disciplined, and retaliated against by her supervisor, after she refused to respond to his sexual demands. He steadily complained about her until she was terminated.

Noticeably absent from these contentions is any mention of any fact which would arguably support a retaliation claim pursuant to the ADA. Accordingly, the parties are advised that such a claim may not be presented to the jury in this case because the Pretrial Order, which supplants the pleadings does not include such a claim.

## VI. CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

(1) Roper's Motion for Summary Judgment (Doc. #17) is GRANTED with respect to all counts against it, and all claims against Roper are DISMISSED WITH PREJUDICE.

(2) Neptune's Motion for Summary Judgment (Doc. #17) is DENIED as MOOT with respect to Walton's claims of sexual harassment (Count One) as Walton has specifically abandoned such claims.

(3) Neptune's Motion for Summary Judgment is GRANTED with respect to Walton's claims of age discrimination (Count Two), and those claims are DISMISSED WITH PREJUDICE.

(3) Neptune's Motion for Summary Judgment (Doc. #17) is DENIED with respect to all of Walton's claims of retaliation pursuant to Title VII only (Count Four) and to her claim of discrimination pursuant to the ADA (Count Three).

DONE this the 20th day of October, 2009.

                      /s/ Mark E. Fuller

                CHIEF UNITED STATES DISTRICT JUDGE